```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF INDIANA
 2                         HAMMOND DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4   vs.                              )   2:23-CR-131
                                      )
 5   MORRELL STEVEN NEELY,            )
                                      )
 6         Defendant.                 )

 7
                     TRANSCRIPT OF BOND REVOCATION HEARING
 8                           December 4, 2024
                  BEFORE THE HONORABLE ANDREW P. RODOVICH
 9                  UNITED STATES DISTRICT MAGISTRATE

10

11   A P P E A R A N C E S:

12   FOR THE GOVERNMENT:

13                            Francis Sohn
                              United States Attorney's Office
14                            5400 Federal Plaza, Suite 1500
                              Hammond, Indiana  46320
15                            (219) 937-5500

16   FOR THE DEFENDANT:

17                            Patrick W. Young
                              Attorney at Law
18                            4231 Broadway
                              Gary, Indiana  46409
19                            (219) 884-2388

20   ALSO PRESENT:           Ed DiMichele, U.S. Probation

21

22

23

24

25
```

1                    INDEX OF WITNESSES

2  FOR THE GOVERNMENT:                   <u>Page</u>

3  **BIJAL SHAH**
    Direct Examination by Mr. Sohn         8
4  Cross-Examination by Mr. Young        13
    Redirect Examination by Mr. Sohn     23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following is a transcript of proceedings produced

2    from the FTR audio recording:)

3        **THE COURT:**  -- 2:23-CR-131 entitled United States of

4  America versus Morrell Neely.  Show the government is

5  represented by Frank Sohn, Assistant U.S. Attorney.  The

6  defendant is not present, but he's here with his attorney,

7  Mr. Young.  We are here on the government's request to revoke

8  the bond.

9        Mr. Young, where is your client?

10       **MR. YOUNG:**  Your Honor, I received information early

11  this morning and throughout the morning this morning that my

12  client is currently hospitalized at Ascension Point Hospital in

13  Chicago.  I just received a letter -- I just received a letter

14  approximately 30 seconds ago -- I showed to the government --

15  which is a letter from a doctor there that verifies he actually

16  is in the hospital.

17       He had a medical event sometime early this morning or late

18  last night where he was taken to the hospital.  The document I

19  have is from a Dr. Yasiel Lacalle, M.D., signed by him from

20  Ascension Health Telemetry Medical, 2900 North Lakeshore Drive,

21  Chicago, Illinois.

22       The letter says:  "To Whom it May Concern, dated for

23  today's date.  This letter is to certify that Morrell Neely is

24  currently hospitalized in St. Joseph Hospital Chicago for a

25  serious medical problem.  When he is evaluated further, we will

1   know when he can return to work.  If you have any questions or

2   concerns, please call me."

3        Additionally, I would indicate to the Court that he is on

4   an ankle bracelet.  I did not speak to the pretrial services

5   officer.  I do have his number.  I did not speak to him, but I

6   would say that they verified -- and I was told it was verified

7   that he is actually in the hospital at that facility.

8        **THE COURT:**  Did they say what the medical emergency

9   was?

10       **MR. YOUNG:**  As I understand it, he blacked out or had

11  a heart palpitation and fell down some stairs and hit his head

12  causing damage to his head and some damage to his neck, as I

13  understand it.

14       **THE COURT:**  Mr. Sohn, have you had a chance to review

15  the letter?

16       **MR. SOHN:**  I have, Your Honor.  Obviously, this is --

17  no comment on Mr. Young, but the letter, obviously, we don't

18  have it in front of us.  We don't know if it is genuine.  We

19  haven't received any documents from anyone other than a party

20  to this case.  Obviously, if Mr. Neely did, in fact, have a

21  medical emergency, I would not expect him to be here.  I would

22  like to have some way to confirm that other than Mr. Neely's

23  word, and even the letter, it could have been signed by anyone,

24  Your Honor.

25       **THE COURT:**  How much time do you need to get medical

1   records giving us the exact reason for his hospitalization?  Is

2   24 hours enough?

3          **MR. YOUNG:**  Certainly I'm at the Court's mercy, and I

4   will do whatever needs to be done to get that verification,

5   Your Honor.  I don't -- I can't say.  I don't know.  Generally,

6   takes a little bit more time to get that information.

7          **THE COURT:**  Did they give any indication when he

8   would be discharged?

9          **MR. YOUNG:**  No, I do not -- he's telling me that he

10  may need surgery on his neck.  I don't know.  Again, I don't

11  have any medical records to verify what the exact problem is.

12  Of course I'll do whatever I can do to get those records as

13  quickly as I can, Your Honor.

14         **THE COURT:**  Are both attorneys available for a

15  telephone call tomorrow at 11:00?  I have a settlement

16  conference starting at 12:30, and I never know whether those

17  are going to last a half hour or an hour or half a day or

18  longer so -- I'd like to get, at least, some information.  You

19  available at 11:00 tomorrow?

20         **MR. SOHN:**  Your Honor, I have a call at 10 a.m.  I

21  think it should be done by then.  I think I can be available.

22         **MR. YOUNG:**  I'm available, Judge.

23         **THE COURT:**  Okay.  We can make -- you can make the

24  necessary arrangements with my courtroom clerk, and we will see

25  what the status is on -- first, I want to know -- first verify

1  that the injuries and hospitalization is genuine and, second,

2  what the release date is.

3      I assume that had Mr. Neely appeared today you were going

4  to stand by your request to have the bond revoked?

5          **MR. SOHN:**  Yes, Your Honor.

6      In fact, we do have Mr. Neely's landlord here today.  He

7  is a witness from out of town; so when Your Honor feels it

8  appropriate, we would like to have his testimony taken today

9  just so he doesn't have to come back.  He lives in Houston,

10 Your Honor.

11         **THE COURT:**  Do you object to proceeding without

12 Mr. Neely on that issue?

13         **MR. YOUNG:**  I do, Judge, because his liberty is at

14 stake and he needs -- he has a right to be here.  And I need

15 him to assist me in his defense, and he needs to hear what it

16 is the witness would have to say.

17         **THE COURT:**  Where does the landlord live?

18         **MR. SOHN:**  Dr. Shah lives in Houston, Your Honor.

19         **THE COURT:**  He came from Houston?

20         **MR. SOHN:**  Yes, your Honor.  Just by way of

21 explanation, Mr. Neely is, obviously, in litigation with

22 Mr. Shah -- or Dr. Shah.  There was supposed to be a conference

23 in one of those litigations today on an eviction matter for the

24 property.  Mr. Neely, it is my understanding, fired his

25 attorney at some point in the past 24 hours in that matter and

1   that matter was delayed.  Mr. Shah was already on his way

2   here -- Dr. Shah was already on his way here when that notice

3   came through so that's why Dr. Shah is here today.

4          **THE COURT:**  If I recall from our last hearing, this

5   matter had tentatively been set for yesterday but because of

6   the civil matter we agreed to proceed today.  So you're telling

7   me the civil matter did not go either?

8          **MR. SOHN:**  That's my understanding, correct,

9   Your Honor.

10          **THE COURT:**  So he fired his civil attorney before the

11   civil hearing and he fired his criminal attorney before the

12   criminal hearing?

13          **MR. SOHN:**  That is my understanding, yes, Your Honor.

14          **THE COURT:**  All right.  The normal rules of evidence

15   do not apply in bond hearings.  The government frequently

16   submits proffers or affidavits; so noting your objection, I

17   will let the doctor testify since he is here.

18     Why don't you call him as a witness.

19          **MR. SOHN:**  Yes, Your Honor.  The government would

20   call Dr. Bijal Shah.

21          **THE COURT:**  I didn't bring my tablet out because I

22   was told the defendant wasn't here, so I need something to take

23   a few notes.

24     How do you like our weather, Doctor?

25          **THE WITNESS:**  It is a little too dreary for my taste.

1          **THE COURT:**  Thank you.

2      If you raise your right hand, the clerk will administer an

3  oath to you.

4      (An oath was administered.)

5          **THE WITNESS:**  I do.

6          **DEPUTY CLERK:**  Thank you.  Please be seated.

7          BIJAL SHAH, GOVERNMENT'S WITNESS, SWORN

8                    **DIRECT EXAMINATION**

9  BY MR. SOHN:

10  **Q.**   Good afternoon, Dr. Shah.

11  **A.**   Good afternoon.

12  **Q.**   You and I along with Special Agent Trinch have spoken --

13          **THE COURT:**  We don't have his name.  Would you get

14  his name on the record.

15          **MR. SOHN:**  I'm sorry, Your Honor.

16  **Q.**   Can you please state your full name and spell your last

17  name for the record.

18  **A.**   Sure.  First name Bijal, B-I-J-A-L, last name Shah,

19  S-H-A-H.

20  **Q.**   Dr. Shah, you and I and Special Agent Trinch have spoken

21  before about this matter before; is that correct?

22  **A.**   Yes.

23  **Q.**   Are you the owner of Bumal Properties LLC?

24  **A.**   Yes.

25  **Q.**   And is that something that you co-own with your wife?

1  **A.**    Yes.

2  **Q.**    Is there anyone else who's an owner or member of that LLC?

3  **A.**    No.

4  **Q.**    Is Bumal Properties -- is that the owner of record of 1922

5  West Grace Street in Chicago, Illinois?

6  **A.**    Yes.

7  **Q.**    We're here today in a matter involving Morrell Neely.  Are

8  you familiar with Mr. Neely?

9  **A.**    Yes.

10 **Q.**    Is Mr. Neely currently residing at the property owned by

11 Bumal Properties at 1922 West Grace Street?

12 **A.**    Yes.

13 **Q.**    And Mr. Neely is leasing that property from Bumal

14 Properties LLC, correct?

15 **A.**    Yes.

16 **Q.**    Did your real estate agent send you an application that

17 Mr. Neely completed for that lease?

18 **A.**    Yes.

19 **Q.**    And did you review that application?

20 **A.**    Yes.

21 **Q.**    Did you see on that application that Mr. Neely answered --

22 was asked to answer a question whether or not he had ever

23 declared bankruptcy?

24 **A.**    Yes.

25 **Q.**    And Mr. Neely answered no to that question; is that

1   correct?

2   **A.**    Yes.

3   **Q.**    Did you see on that application that Mr. Neely was also

4   asked if he had ever been asked to leave a property by a

5   landlord?

6   **A.**    Yes.

7   **Q.**    And did Mr. Neely also answer no to that question?

8   **A.**    Yes.

9   **Q.**    Did you later come to learn that Mr. Neely has declared

10  bankruptcy multiple times?

11  **A.**    Yes.

12  **Q.**    And did you later come to learn that Mr. Neely has been

13  the defendant in an eviction action at least three times?

14  **A.**    Yes.

15  **Q.**    If you had known, Dr. Shah, that Mr. Neely had previously

16  declared bankruptcy would you have rented your property to him?

17  **A.**    Absolutely not.

18  **Q.**    If you had known that Mr. Neely had been evicted or had

19  been the defendant in an eviction action at least three times,

20  would you have rented your property to him?

21  **A.**    Absolutely not.

22  **Q.**    So, Dr. Shah, Mr. Neely ultimately signed a lease starting

23  on or about June 1st, 2024; is that correct?

24  **A.**    That's correct.

25  **Q.**    Did Mr. Neely pay his first month's rent?

1   **A.**    To the Realtor he did.

2   **Q.**    And did he also pay a security deposit?

3   **A.**    He did, yes; $10,000.

4   **Q.**    And where did that security deposit go to?

5   **A.**    It's in an interest-bearing account per Chicago's RLTO; so

6   it's in the bank account being held there.

7   **Q.**    And when you say, "RLTO," does that mean Residential

8   Landlord Tenant Ordinance?

9   **A.**    Yes, that's correct.

10  **Q.**    Other than those two payments, the first month's rent

11  going to the leasing agent and the $10,000 that went into a

12  separate account, has Mr. Neely made any payments to you?

13  **A.**    No.

14  **Q.**    So just as an estimate -- do you have an estimate at this

15  point about how much Mr. Neely owes to you in back rent?

16  **A.**    Sure.  11,500 times July, August, September, October,

17  November, and now December.  So 11,500 times six, that's how

18  much he owes me.

19  **Q.**    That by my math is -- $69,000?

20  **A.**    That's correct.

21  **Q.**    What kind of financial impact has that had on you, if any?

22  **A.**    I mean, it has been financially pretty devastating having

23  to pay two mortgages.  It has definitely impacted our standard

24  of living -- our living standards because, you know, of having

25  to pay for two different mortgages.

1   **Q.**   And are you -- just to be clear, are you currently in any

2   litigation against Mr. Neely?

3   **A.**   Yes, I'm trying to evict him.

4   **Q.**   Is that -- is that eviction lawsuit the only lawsuit you

5   have against Mr. Neely?

6   **A.**   That and another civil case against him that I'm pursuing

7   along with a Realtor.

8   **Q.**   And just for the record, was there supposed to be a

9   hearing in one of those cases yesterday?

10   **A.**   Yes, eviction case.  There was supposed to be a hearing

11   yesterday.  Unfortunately, Mr. Neely fired his attorney over

12   the weekend; and, as a result, because of the rules related to

13   RLTO, the case has been delayed by a week.  So the whole thing

14   has been delayed because of that.

15   **Q.**   Thank you, Dr. Shah.

16           **MR. SOHN:**  I don't have any further questions.

17           **THE COURT:**  What was the amount of the monthly

18   payment?

19           **THE WITNESS:**  11,500.

20           **THE COURT:**  Oh, okay.

21           **MR. SOHN:**  Your Honor, if I may just have one or two

22   more questions?

23           **THE COURT:**  Go ahead.

24   **BY MR. SOHN:**

25   **Q.**   Dr. Shah, are you currently trying to sell this property?

1    **A.**    I am, yeah.

2    **Q.**    And does Mr. Neely's residence -- or remaining in that

3    property have any impact on your ability to sell the property?

4    **A.**    It does.

5    **Q.**    What kind of impact does it have?

6    **A.**    I'm hoping to sell the property as soon as I can evict

7    Mr. Neely so that -- you know, there's additional costs, you

8    know, the mortgage plus the property taxes and the maintenance

9    and general upkeep, utilities and all that.  Because that's a

10   huge financial burden on us.

11   **Q.**    All right.

12            **MR. SOHN:**  Thank you, Your Honor.  I don't have

13   anything further.

14            **THE COURT:**  Any cross, Mr. Young?

15            **MR. YOUNG:**  Yes, Judge.  Thank you.

16                        **CROSS-EXAMINATION**

17   **BY MR. YOUNG:**

18   **Q.**    Dr. Shah, I read your lawsuit against Mr. Neely.  There

19   are other defendants included in that lawsuit; is that correct?

20   **A.**    Yes.

21   **Q.**    And one of those defendants is an entity, I believe, by

22   the name of @properties.com or something along those lines?

23   **A.**    That's correct.

24   **Q.**    And it appeared to me, correct me if I'm wrong, that your

25   eviction lawsuit mainly -- or mostly makes allegations against

1  that entity; is that fair?

2  **A.**    That's fair to say, yeah.  Yeah.

3  **Q.**    Such that Mr. Neely is included in the lawsuit as a

4  defendant but also this @properties is involved in some way in

5  your theory of the case; is that correct?

6  **A.**    I mean, they're both involved, I would say.

7  **Q.**    Okay.  And this application you speak of, who gave this to

8  you?

9  **A.**    The leasing agent, the Realtor.

10 **Q.**    And who is that person?

11 **A.**    Lee Marcus.

12 **Q.**    And did you rely on Mr. Marcus's -- strike that.

13      Did you rely on the integrity of the account -- of the

14 application based on what Mr. Marcus told you?

15 **A.**    I did, yes.

16 **Q.**    And do you have any idea whether or not Mr. Neely had ever

17 reviewed or looked at that application?

18 **A.**    I can't say whether he looked at it.  I don't know.

19 **Q.**    Okay.  And you did receive -- you said you received a

20 $10,000 deposit?

21 **A.**    That's correct.

22 **Q.**    And you also received money that went to the real estate

23 agent.  How much was that?

24 **A.**    The money went directly to the real estate agent, and it

25 was the first month's rent, 11,500.

1   **Q.**   That would be about 21,500 that was paid by Mr. Neely for

2   rental of the property; is that correct?

3   **A.**   Yes.  Yes.

4   **Q.**   And did you receive any other monies --

5   **A.**   No.

6   **Q.**   -- from Mr. Neely?

7         Wasn't there a third check that was paid to you at some

8   point?

9   **A.**   No.

10  **Q.**   So if there was a third check you're not aware of it or

11  you don't know about it?

12  **A.**   No.

13  **Q.**   All right.  Other than what Mr. Marcus and his firm, I

14  guess it's @properties, gave to you, did you do any other

15  independent investigation such as a credit report, a docket

16  search?

17  **A.**   It was all done by the Realtor.

18  **Q.**   And if I'm reading your lawsuit correctly, you place quite

19  a bit of blame on the Realtor for a number of things, breach of

20  duty, fraud, and other things that you seem, in your lawsuit,

21  to place on -- directly on the shoulders of that

22  @properties.com and Lee Marcus and a Mr. -- is it Sobin?

23  **A.**   Sobin.

24  **Q.**   And a Mr. Sobin; is that correct?

25  **A.**   I think they are both involved.  I mean, one -- you know,

1  without Mr. Neely, you know -- you know, I think, you know,

2  blame goes both ways.

3  **Q.**   Is it fair to say that @properties and Mr. Marcus and

4  Mr. Sobin were the main movers -- or motivators in putting this

5  contract together?

6  **A.**   Yeah, I think it's fair to say that.

7  **Q.**   And it was to their benefit to put this -- to get this

8  contract -- or this house closed and rented; is that fair to

9  say?

10 **A.**   And for Mr. Neely, yes.  And for Mr. Neely to have a place

11 to stay, yes.

12 **Q.**   Yes.  Now, you indicated there was another case against

13 Mr. Neely other than the eviction case?

14 **A.**   The eviction case and then the civil case that I have

15 against him for fraud.

16 **Q.**   Okay.  And if I understood you correctly, it was the

17 eviction case that was continued for a week from yesterday?

18 **A.**   That's correct.

19 **Q.**   And the other case is -- is that pending in Cook County?

20 **A.**   Yeah, it's possession with intent in Cook County.  I think

21 we have a court date in January.  I don't know exactly what

22 date it was, but it's in January.

23 **Q.**   And is the basis of that lawsuit the same or different

24 than the eviction lawsuit?

25 **A.**   No, the eviction lawsuit is, you know, taking possession

1    of the property.  The civil lawsuit is -- you know, it's -- I'm

2    not a lawyer, but as far as I understand it, you know, the

3    Realtor -- the Realtor's company and Mr. Neely are all part of

4    that lawsuit.

5    **Q.**    So they're named defendants in the other lawsuit as well?

6    **A.**    Yes, the other one, the civil one with the Court date in

7    January.

8    **Q.**    Are the facts of that lawsuit different than the facts of

9    the eviction lawsuit?

10   **A.**    I think -- yeah, I think they're pretty similar.

11   **Q.**    Okay.  And do you know why there was two lawsuits brought

12   as opposed to one?

13   **A.**    That's what my attorney recommended.

14   **Q.**    Okay.  If I may, who is your attorney on those lawsuits?

15   **A.**    Blake Horwitz.

16   **Q.**    Prior to renting the property to Mr. Neely, did you ever

17   meet him personally?

18   **A.**    I met him on the -- I met him on the day I did the

19   walk-through with him.

20   **Q.**    And at that time you discovered he was an African

21   American?

22   **A.**    Yes.  I did not know that he was African American prior to

23   seeing the property.

24   **Q.**    Did -- would that or did that have any bearing on your

25   decision-making to rent the property?

1   **A.**   Absolutely not.

2   **Q.**   I read in some documents that were provided to me that

3   that was some issue to you?

4   **A.**   No, it was not.

5   **Q.**   No issue whatsoever?

6   **A.**   Absolutely not.

7   **Q.**   Okay.

8   **A.**   Prior to that -- I did Google him prior to signing the

9   lease.  I did Google him, and he has a website.  You know, as I

10  understand, he was a respectable businessman in the oil

11  distribution industry.  So I already knew -- before we even

12  signed the lease, I already knew he was African American so

13  that had no bearing on, you know, me signing a lease with him.

14  **Q.**   Do you remember when you sent the first notice of -- that

15  he was in breach of the lease agreement, the date?

16  **A.**   Yeah.  So I gave him, I think, 20 days.  He initially --

17  he's supposed to pay the rent by the 5th of the month, and I

18  texted him saying, hey, the rent is still not here, you know;

19  so he made all sorts of excuses saying there's some sort of --

20  you know, his bank account had gotten hacked and his funds had

21  been frozen.  So I gave him, you know, time to sort that out;

22  so I think -- I believe I gave him a full month before I sent

23  him the 5-day, you know, rent notice that was, you know -- I

24  had a processor serve that to him.

25  **Q.**   So he moved in in June of 2024, I think?

 1   **A.**    June 1st, yeah.  Actually, I let him move in a little bit

 2   early, like a day or two days early, on his request.

 3   **Q.**    He had paid -- so the first month he missed would have

 4   been then July, is that your testimony?

 5   **A.**    Yes.  Yes, exactly.

 6   **Q.**    And then you would have sent him the 5-day notice in

 7   August, I think, is what you're saying?

 8   **A.**    I think it was in July, actually, but it was towards the

 9   end of July.  I can't recall the exact day, but it was towards

10   the end of July.

11   **Q.**    So he was more than -- you say the rent was due on the

12   1st?

13   **A.**    Yes.  So there's a 5-day grace period to pay the rent;

14   but, you know, in the interest of, you know, just being -- in

15   my -- in the interest of just being generous, I waited until

16   the 20th, you know, to -- I thought he was, you know -- he was

17   a respectable businessman.  I thought he got hacked; so, you

18   know, until the 20th, that's when I -- you know, I don't know

19   the exact date, but it was, like, towards the end of the month

20   when I finally sent him the 5-day notice.

21   **Q.**    When did you file your lawsuit?

22   **A.**    I can't recall the exact date, but I think probably in

23   September -- are you talking the eviction?

24   **Q.**    The eviction, yes, sir.

25   **A.**    As soon as -- I think it was in August, I think.  The

1  other one I think was in September, based on my recollection.

2  **Q.**   Did Mr. Neely attempt to cure the problem during this time

3  period?

4  **A.**   Nope.

5  **Q.**   Was he represented at that time?

6  **A.**   He is -- no, not at that time.  I think he eventually got

7  an eviction attorney.  Yeah, he eventually got one.

8  **Q.**   And did that attorney contact your attorney, or do you

9  know?

10  **A.**   I don't know.  I don't know.

11  **Q.**   Was there an attempt to -- do you know whether or not

12  there was an attempt to amicably resolve this rental arrearage?

13  **A.**   Not until very recently did they give us an offer.

14  **Q.**   Oh, they did?

15  **A.**   Yes.  So they wanted me to dismiss the lawsuit, seal the

16  file.  I was opposed to him sealing the file, but I was okay

17  for him to leave the property by the 15th of December.  But not

18  until recently -- when he -- he fired his own attorney, you

19  know, in my opinion, to buy more time -- did, you know, that

20  come to fruition.

21  **Q.**   So you came here from Texas to attend a hearing yesterday?

22  **A.**   Yes, and this hearing.

23  **Q.**   And this hearing.  And you -- when did you find out the

24  hearing yesterday wasn't going?

25  **A.**   On the flight to -- so I was actually on the plane, that's

1   when my eviction attorney texted me -- or emailed me saying

2   that, you know, the -- his attorney is no longer representing

3   him.

4   **Q.**   But you don't know -- do you know when his attorney would

5   have withdrawn or --

6   **A.**   He said right before court.

7   **Q.**   Like the day?

8   **A.**   On the 2nd, yeah.  December 2nd was when she withdrew,

9   right before court, is what he said.

10  **Q.**   Which would have been Monday?

11  **A.**   So I think there was, like, a pretrial hearing on the 2nd

12  that I didn't have to attend; and then there was a -- you know,

13  the trial -- the jury trial on the 3rd which my attorney said

14  that I had to attend that one.

15  **Q.**   Was that going to be a jury trial for an eviction?

16  **A.**   As far as I understand it.

17  **Q.**   Was it downtown Chicago?

18  **A.**   I presume, yes.

19  **Q.**   Where were you going to court at?

20  **A.**   Downtown.  I think it is Chicago.  Of course, yeah.

21  **Q.**   Okay.  Did you ever ask Mr. Horwitz to do any

22  investigation on Mr. Neely as far as bankruptcies?

23  **A.**   Well -- so I -- my process server, the guy that -- he

24  served Mr. Neely in prior eviction lawsuits, and then he also

25  served him in my eviction lawsuit.  He works for a detective

1    agency, and he actually ran a background check on Mr. Neely and

2    that's when we found out that, you know, he had had multiple

3    bankruptcies, multiple, you know, issues with franchises, you

4    know, and then he has some sort of case with UPS, multiple

5    bankruptcies, multiple evictions.

6    **Q.**    You use the term "my process server"?

7    **A.**    Yes.

8    **Q.**    By that I, I believe you to mean the process server your

9    attorney uses to serve papers?

10   **A.**    Yes.  Yes.  Yes.  Yes.

11   **Q.**    And this gentleman, Mr. Horwitz, is your normal attorney,

12   I guess?

13   **A.**    So the process server, Matthew White, works for my, you

14   know, landlord/tenant attorney, and his name is Michael

15   Griffin; so he's the one that's, you know, involved in evicting

16   Mr. Neely from my property.

17   **Q.**    I see.

18   **A.**    So he's the process server that --

19   **Q.**    Did you ever think to ask Mr. White to do some -- a little

20   legwork on Mr. Neely?

21   **A.**    Oh, I didn't meet Mr. White until after I was -- I decided

22   to evict Mr. Neely.

23   **Q.**    I was a little bit confused when you say "my process

24   server."  I thought maybe you had him on retainer or something.

25   I don't know.

1  **A.**    Figure of speech.  I'm not an attorney.

2  **Q.**    Thank you, Doctor.

3  **A.**    Thanks.

4        **THE COURT:**  No other questions?

5        **MR. YOUNG:**  (No audible response.)

6        **THE COURT:**  Any redirect?

7        **MR. SOHN:**  Very briefly, Your Honor.

8                    **REDIRECT EXAMINATION**

9  **BY MR. SOHN:**

10  **Q.**   Dr. Shah, as a landlord, is it normal for you to rely on

11  the background check conducted by your leasing agent?

12  **A.**   Yes.

13        **MR. SOHN:**  No other questions, Your Honor.

14        **THE COURT:**  I just have one.  The application that

15  you saw, did it have what purported to be a signature by

16  Mr. Neely?

17        **THE WITNESS:**  Yes.

18        **THE COURT:**  And nowadays some things are electronic.

19        **THE WITNESS:**  It was a Docusign.

20        **THE COURT:**  Pardon?

21        **THE WITNESS:**  It was an electronic signature.

22        **THE COURT:**  Okay.  Did it look like cursive, or was

23  it one of these, you know, electronic things that just says

24  signed electronically?

25        **THE WITNESS:**  No, it was cursive.

1       **THE COURT:**  Okay.

2       **MR. SOHN:**  Your Honor, if I may?

3       **THE COURT:**  Go ahead.

4       **MR. SOHN:**  We do have a copy of that lease here if

5   Your Honor would like to see it.  That was obtained from

6   Dr. Shah's attorney, and it does, in fact, have what appears to

7   me to be a cursive signature on it.  And a copy of this has

8   previously been provided to defense counsel as well.

9       **THE COURT:**  Okay.  I'll show Government's Exhibit 1

10  admitted.

11      Can I see that then?

12      You don't have any other questions for the doctor?

13      **MR. SOHN:**  I do not, Your Honor.

14      **MR. YOUNG:**  No, Your Honor.

15      **THE COURT:**  Okay.  Thank you, Doctor.  Have a good

16  flight back.

17      **THE WITNESS:**  Thank you.

18      **THE COURT:**  All right.  Then I will talk to the

19  attorneys at 11:00 tomorrow on the phone, and we will decide

20  how to proceed after that.

21      So thank you.  Have a good afternoon.

22      **MR. YOUNG:**  Thank you, Judge.

23      **MR. SOHN:**  Thank you, Judge.

24      **DEPUTY CLERK:**  All rise.

25      (End of requested transcript.)

1          CERTIFICATE

2       I, Stacy L. Drohosky, certify that the foregoing is a true

3  and correct transcript from the record of proceedings in the

4  above-entitled matter.

5  Date:   December 18, 2024

6                                     S/Stacy L. Drohosky
                                      S/STACY L. DROHOSKY
7                                     Court Reporter
                                      U.S. District Court
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25